CAMPBELL & WILLIAMS
DONALD J. CAMPBELL, ESQ. (1216)
djc@cwlawlv.com
J. COLBY WILLIAMS, ESQ. (5549)
jcw@cwlawlv.com
PHILIP R. ERWIN, ESQ. (11563)
pre@cwlawlv.com
700 South Seventh Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

*Attorneys for Plaintiff*
*Evans Creek, LLC*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| EVANS CREEK, LLC, a Minnesota limited liability company; | CASE NO.: |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| CITY OF RENO, a political subdivision of the State of Nevada | |
| Defendant, | **[JURY DEMAND]** |

Plaintiff Evans Creek, LLC, ("Plaintiff" or "Evans Creek"), by and through its undersigned counsel, hereby brings this Complaint against Defendant City of Reno ("Defendant" or "City") and alleges as follows:

## I.    NATURE OF THE ACTION

1.    Evans Creek is the owner of a large parcel of undeveloped land in the hills above Southwest Reno commonly known as Ballardini Ranch. For more than two decades, Evans Creek has endeavored to develop this land into a master planned community, which is the highest and best use of the property and would achieve a projected economic value exceeding $100 million. And for

1

that entire two-plus decade time period, Evans Creek has faced a brazen pattern of obstruction by local government, including the City, that has sought at every turn to maintain Evans Creek's private property as public, open space for the illegal and uncompensated use by neighboring landowners and local residents.  To accomplish that un-American purpose, the City has repeatedly undermined and blocked Evans Creek's efforts to develop the property without any legitimate basis and in direct contravention of applicable laws, regulations, and, most recently, the recommendations of the City's own staff.  The end result is that Evans Creek and its principals have been treated differently than all other similarly situated property owners simply because they are residents of another state who own what should otherwise be an exceedingly valuable parcel of land that has long been coveted by an amalgam of wannabe stakeholders.

2.      The City's pattern of obstruction recently culminated in May 2020 with the Reno City Council's unanimous denial of Evans Creek's application for annexation of the property notwithstanding that City staff had recommended unconditional approval of the application after analyzing the applicable factors required by law.  Annexation, a well-established procedure by which municipalities incorporate new territory into their domain, is the critical first-step a landowner must undertake to start the process for future development and commercial use of its property.  By refusing to annex the subject property based on a handful of pretextual reasons—an extraordinary event which rarely, if ever, occurs—the City eviscerated any chance Evans Creek had to develop its land for commercial use and drove its economic value—literally—into the ground.  Evans Creek now brings this action to vindicate its rights as a property owner under the Fifth and Fourteenth Amendments of the United States Constitution and to obtain monetary damages from the City that reflect the property's true value.

## II.      JURISDICTION AND VENUE

3.      The Court has jurisdiction over this matter and the parties thereto pursuant to 28 U.S.C. § 1343(a) and 48 U.S.C. § 1983.  Plaintiff brings this action against Defendant, which is

acting under color of state law, for damages to redress past deprivation and to prevent further deprivation of rights secured by the United States Constitution, namely the Equal Protection Clause of the Fourteenth Amendment and the Takings Clause of the Fifth Amendment.

4.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant is the City of Reno, Plaintiff's subject real property is located in unincorporated Washoe County, Nevada, and the events related to the City's denial of Evans Creek's annexation application occurred in Reno, Nevada.

### III.    IDENTIFICATION OF PARTIES

5.    Evans Creek is a Minnesota limited liability company and the owner of a 1,019-acre parcel of land in unincorporated Washoe County, Nevada (the "Property").  Evans Creek is owned and operated by a Minnesota resident who is highly experienced in land development and construction.

6.    The Property comprises ±1,019 acres of property located on the south side of South McCarran Boulevard with frontage spanning ±1,840 feet west and ±1,870 feet east of the intersection at South McCarran Boulevard and Manzanita Lane.

7.    Defendant is the City of Reno, Nevada, which is a municipal corporation organized and existing under the laws of the State of Nevada.

### IV.    GENERAL ALLEGATIONS

**A.    Applicable Land Use Laws, Regulations and Public Bodies.**

8.    The Truckee Meadows Regional Plan ("TMRP") is a comprehensive regional plan that controls the physical development and orderly management of growth in Washoe County for the next 20 years.  Pursuant to Chapter 278 of the Nevada Revised Statutes, the TMRP is revised and updated every 20 years.

CAMPBELL & WILLIAMS
ATTORNEYS AT LAW
700 SOUTH SEVENTH STREET, LAS VEGAS, NEVADA 89101
Phone: 702.382.5222  ●  Fax: 702.382.0540
www.campbellandwilliams.com

3

9.     The TMRP is developed by the Truckee Meadows Regional Planning Commission ("TMRPC") and adopted by the Truckee Meadows Regional Planning Governing Board ("TMRPGB") in accordance with Nev. Rev. Stat. 278.02528.

10.     Pursuant to Nev. Rev. Stat. 278.0282, the local governments participating in the TMRP are required to amend their master plans, facilities plans, and other similar plans to conform to the provisions of the TMRP.

11.     In 2017, the City performed a comprehensive review and overhaul of its Master Plan ("Master Plan"), which is a living document intended to function as a tool for City officials to use in evaluating and making decisions regarding the spatial development of the city, the distribution of different land uses, and the provision of infrastructure and services necessary to support new growth over the next 20 years.

12.     The City's Master Plan includes a Land Use Plan intended to provide guidance for future development within the City of Reno and its Sphere of Influence ("SOI").  The SOI is the "area into which a city plans to expand as designated in a comprehensive regional plan [ ] within the time designated in the comprehensive regional plan."  Nev. Rev. Stat. 268.623.

13.     Nev. Rev. Stat. 268.670 authorizes a city to annex territory following receipt and acceptance of a petition signed by all owners of record of the property to be annexed.  Section 18.04.301 of the City of Reno Municipal Code ("RMC") establishes the framework for the annexation application and review process.  Section 2.1D of the Master Plan similarly lists factors for the City to consider when determining whether to annex property.

14.     The purpose of annexation is to extend the municipal boundaries of the City to provide the government services essential for sound urban development and protection of the health, safety and welfare in the annexed area.  For property owners outside of the City, annexation is the first step towards development and commercial use.

CAMPBELL & WILLIAMS
ATTORNEYS AT LAW
700 SOUTH SEVENTH STREET, LAS VEGAS, NEVADA 89101
Phone: 702.382.5222  ●  Fax: 702.382.0540
www.campbellandwilliams.com

**B.**   **The History Of The Property And Community Efforts To Block Development.**

*Evans Creek Acquires the Property from the Ballardini Family*

15.     In 1937, Antonio Ballardini acquired 1,500 acres of the 25,000-acre Wheeler Ranch in unincorporated Washoe County which became known as Ballardini Ranch.  The Ballardini family owned the property until 1998 and, for the most part, raised hay and cattle, operating the property as a typical Northern Nevada cattle ranch.

16.     For decades, neighboring landowners—who were aided and abetted by local municipalities including the City and Washoe County—endeavored to prevent development and maintain Ballardini Ranch as open space for their own enjoyment.  For example, in 1988, neighboring landowners went so far as to attempt to create a new city through annexation known as Sierra Meadows, which would have encompassed large swaths of Ballardini Ranch and prevented future development.  The Ballardini family filed suit to stop the annexation and incorporation of the proposed city of Sierra Meadows and, in October 1988, the Honorable James Guinan of the Second Judicial District Court permanently enjoined the Board of County Commissioners and would-be city incorporators from carrying out their scheme.  Specifically, Judge Guinan ruled that private citizens did not have the legal right to seize their neighbors' property as that right is reserved for the government if it can establish a valid public purpose and compensate the owner for its property's highest and best value.

17.     In 1989, the Ballardini family decided to sell a portion of Ballardini Ranch to resolve an estate tax lien on the property.  They were also afraid the unlawful behavior of the neighboring landowners who wanted to maintain the land as open space would destroy the value of Ballardini Ranch.

18.     In 1997, the Ballardini family entered into a purchase agreement to sell the Property to Everest Development Company, LLC ("Everest"), a company owned by the same principals as Evans Creek.

19.     In 1998, the Ballardini family transferred title to 1,019 acres of Ballardini Ranch to Evans Creek Limited Partnership, an entity Everest formed to take ownership of the Property.  Evans Creek's principals planned to move their real estate business to Nevada, build a home on the Property, and develop a master planned community—which is the highest and best use of the Property.

20.     The Property was located in the unincorporated territory of Washoe County and classified as suitable for residential development under the TMRP and the County Comprehensive Plan.  The northern 419 acres of the property were located within the City's SOI, as designated by both the TMRP and the Master Plan, and were subject to the City's land use planning and zoning regulations.  The southern 600 acres, however, were not located within the City's SOI and were subject to the land use and zoning regulations of Washoe County.

### *Evans Creek's Initial Plans for Development of the Property*

21.     In 1997, Evans Creek began efforts to develop the Property and, on November 1, 1997, requested an amendment to the City's SOI to include the southern 600 acres for future annexation.  Evans Creek also sought an amendment to the Regional Plan Land Use Diagram that would reclassify areas of rural and rural reserve to allow a mix of urban, suburban, rural, and rural reserve.

22.     Evans Creek's intention to develop a master planned community was hardly unconventional given that the Property was surrounded by the other master planned communities that had been approved by the City, including but not limited to Arrow Creek, Lakeridge, and Caughlin Ranch.  Evans Creek, however, was immediately viewed as an unwelcome interloper into the region and its development plans were met at every juncture with vociferous hostility from community members and local government officials from the City and Washoe County.  Certain of those community members and government officials even went so far as to threaten Evans Creek with entitlement obstruction and demand the immediate re-sale of the Property to Washoe County.

23.     Evans Creek's original planning concept for the Property called for up to 2,226 dwelling units with 2,150 dwelling units located in the City and 76 dwelling units in unincorporated Washoe County.  Evans Creek's planning concept also proposed to transfer approximately 500 acres of open space to Washoe County at no cost.

24.     Based on the overt hostility and threats from community members and government officials from the City and Washoe County, Evans Creek withdrew its initial applications to develop the Property.

### Washoe County Conspires to Force a Sale of the Property by Blocking All Attempts to Develop the Property

25.     From 2000 to 2004, the Washoe County Commission, along with the City and a coalition of conservation groups, engaged in a series of malicious acts to sabotage Evans Creek's attempts to develop the Property so that Washoe County could acquire the Property at its lowest possible value and maintain it as open space.

26.     In early 2000, Evans Creek submitted its next development plan and application for an amendment to the TMRP, which was denied.

27.     In February 2000, the Washoe County Commission adopted a resolution, without notice to Evans Creek, to acquire the Property for the alleged implementation of the Washoe County Regional Open Space Plan that was adopted by the Regional Planning Commission in 1994.  The purpose of the resolution was to prevent all attempts to develop the Property as well as to prevent the value of the property from increasing, as an increase in value would translate to an increase in acquisition price.  Additionally, Washoe County planned to apply for and receive federal funding through the Southern Nevada Public Land Management Act ("SNPLMA") to acquire the Property.

28.     Next, in September 2001, the Reno City Council (the "City Council") adopted a resolution pledging to assist the County in its acquisition of the Property and further thwart Evans Creek's attempts to develop the Property.

CAMPBELL & WILLIAMS
ATTORNEYS AT LAW
700 SOUTH SEVENTH STREET, LAS VEGAS, NEVADA 89101
Phone: 702.382.5222  •  Fax: 702.382.0540
www.campbellandwilliams.com

29.     Notwithstanding the City Council's resolution, a draft of the 2002 TMRP was subsequently introduced showing the entire Property as being located within the City's SOI as well as the City's section of the Truckee Meadows Service Area.  Washoe County opposed this draft of the 2002 TMRP due to the fact that the inclusion of the entire Property within the City's SOI, as well as the inclusion of the Property in the TMSA, would drive up the appraised value of the Property and make Washoe County's potential acquisition of the Property impossible.

30.     In April 2002, Evans Creek filed its first application with the City for annexation of the Property ("2002 Annexation Application") and, in May 2002, submitted its first PUD application to the City.

31.     The TMRPGB adopted the updated 2002 TMRP in May 2002 and excluded the southern 600 acres of the Property from the Reno SOI and TMSA.  This exclusion was the result of concerted lobbying by the City and Washoe County designed to ensure that the appraisal value of the Property would not increase.

32.     Shortly thereafter, as a result of Washoe County's and the City's efforts to suppress the value of the Property, Evans Creek terminated sale negotiations with Washoe County and withdrew the 2002 Annexation Application.

33.     In 2003, the City of Reno adopted an Annexation Program, which identified the northern 419 acres of the Property as within the City's SOI and the City's "7-year Annexation Area."

34.     In light of the adoption of the Annexation Program, Evans Creek filed its second application with the City to annex the entire Property ("2003 Annexation Application").  Washoe County opposed this annexation request as it would increase the value of the property and result in higher acquisition costs.

35.     In September 2003, the City denied the 2003 Annexation Application so that the price of the property would not increase beyond Washoe County's financial means.

### *Evans Creek's Lawsuit Against Washoe County and Ultimate Settlement*

36.     In July 2004, Washoe County adopted a resolution to condemn the Property for open space unless Evans Creek agreed to sell the Property at a price unilaterally set by Washoe County. As a result of this draconian action, Evans Creek offered to sell the Property—without condemnation being necessary—as long as a customary and fair three-neutral-appraiser process was utilized to determine the fair market value of the Property.  Realizing this customary process would thwart its plan to acquire the Property for pennies on the dollar, Washoe County refused to utilize the three-appraiser process, and no agreement to purchase the Property was reached.

37.     In August 2004, Washoe County illegally initiated eminent domain proceedings in an attempt to acquire the Property, ostensibly using SNPLMA funds even though Washoe County's access to such funds had been forcibly revoked by the United States government when Evans Creek terminated sale negotiations years earlier.  In response, Evans Creek filed suit against Washoe County to prevent the unlawful seizure of the Property ("Washoe County Litigation").

38.     Ultimately in 2006, following years of litigation and on the eve of trial, Evans Creek and Washoe County reached a settlement once Washoe County realized its potential exposure in the case would exceed $100,000,000—the true value of the Property.

39.     Under the parties' settlement agreement (the "Settlement Agreement"), Washoe County agreed to pay $13,500,000 to Evans Creek and its affiliates.  The Settlement Agreement further provided, *inter alia*, that (1) Washoe County will administer any development applications or requests by Evans Creek in a good faith and fair manner; (2) Washoe County agrees not to oppose Evans Creek's application to any governmental agency for inclusion in the TMSA the southern 600 acres of the Property; (3) Washoe County would not oppose Evans Creek's applications for the amendment of the TMRP, the County's Comprehensive Plan and/or the City's Master Plan or zoning matters related to density; and (4) Washoe County would not oppose Evans Creek's application for transfers of density and clustered development.

40.     Additionally, Evans Creek agreed, *inter alia*, to: (1) forego a right-of-first refusal of significant value and facilitate the purchase and sale of over 100 acres of the Ballardini family's land by the County; and (2) dedicate as privately owned and deed-restricted open space of at least 289 acres of the Property upon approval of its development applications.   Under the Settlement Agreement, these concessions were intended to satisfy any requirements under any laws and ordinances for the provision of open space, parks, public road access, public trails access and wildlife habitat on the Property.

41.     Evans Creek was led to believe that the Settlement Agreement would finally pave the way for development of the Property.

### The City Induces Evans Creek to Enter the City's Service Area

42.     In fall 2006, City staff encouraged Evans Creek to apply for the acceptance of the southern 600 acres of the Property into the City's section of the TMSA as the northern 419 acres were already included.  By transferring the southern 600 acres into the City's section of the TMSA, City staff led Evans Creek to believe it could secure zoning designations consistent with the City's translation table and the then-existing Single Family Residential designation for the northern 419 acres together with the property rights secured by the Settlement Agreement with Washoe County. To that end, the City represented to Evans Creek that inclusion in the City's section of the TMSA would be the first step towards development with annexation and other approvals to follow thereafter.  In reality, by inducing Evans Creek to transfer the southern 600 acres into the City's section of the TMSA, the City intended to downzone, impair and obstruct future development of the Property without fair compensation.

43.     Based on the City's representations, Evans Creek submitted its TMSA application in 2007, which was approved, thereby placing the entire Property within the City's section of the TMSA.  The City, in turn, began to exercise extra-jurisdictional authority over land use and permitting on the Property such that no development could proceed without annexation into the City.

10

44.     After approving Evans Creek's TMSA application, the City Council passed a resolution to change the zoning designation for the southern 600 acres of the Property.  Rather than amend the zoning designation for the southern 600 acres of the Property to match the existing Single Family Residential zoning designation for the northern 419 acres, however, the City unilaterally designated the southern 600 acres with a newly created Special Planning Area Master Plan land use designation.  The City's conduct in this respect conflicted with its staff's prior representations that Evans Creek would obtain zoning designations consistent with the City's translation table and the then-existing Single Family Residential designation for the northern 419 acres together with the property rights secured by the Settlement Agreement with Washoe County.  This Special Planning Area Master Plan land use designation imposed onerous burdens on Evans Creek, presented significant hurdles to development of the Property, and rendered the effort and expense to secure appropriate densities and services for the Property futile.

### The City Undermines and Constructively Denies Evans Creek's Annexation Application and Master Plan Amendment Request in 2014

45.     In early 2014, former Reno Mayor Bob Cashell strongly encouraged Evans Creek to submit another application for annexation and advance the Property towards development.  As a result, Evans Creek agreed to apply for annexation and sought guidance from City staff to ensure that this latest application was not futile.  The City staff feigned support and even reviewed Evans Creek's proposed application prior to submission for compliance with the required guidelines.

46.     In May 2014, Evans Creek submitted its application for annexation ("2014 Annexation Application") in reliance on representations by City staff that they would support annexation and the appropriate density intensification of the Property.  Additionally, Evans Creek submitted a Master Plan Amendment application seeking a Mixed Residential designation for the northern 419 acres and a Single-Family Residential designation for the southern 600 acres.

CAMPBELL & WILLIAMS
ATTORNEYS AT LAW
700 SOUTH SEVENTH STREET, LAS VEGAS, NEVADA 89101
Phone: 702.382.5222  •  Fax: 702.382.0540
www.campbellandwilliams.com

47.     In response to this submission, City staff for the first time demanded that Evans Creek provide supplemental information and analyses including traffic and fiscal studies that City staff had previously informed Evans Creek would not be necessary.   Notwithstanding the contradictory representations from City staff, Evans Creek complied with the request for supplemental information and analyses.

48.     In direct contradiction to their prior representations and notwithstanding Evans Creek's submission of the above-referenced materials upon request, City staff sent a memorandum to Evans Creek recommending blanket denial of the 2014 Annexation Application and request for a Master Plan amendment, primarily using open space and parks issues as a pretense.

49.     In light of the inconsistent and misleading conduct of City staff, Evans Creek notified the City it intended to terminate the 2014 Annexation Application and Master Plan amendment application.   In response, City staff stated they "strongly encourage [Evans Creek] to annex into the City and have expressed [their] intentions through Regional Planning amendments by including [the Property] in [the City's] sphere of influence."   City staff further reiterated that the "the City has exercised extraterritorial authority over these lands which means land use and building permit authority. [Evans Creek] has existing entitlements (land use). No permits can be issued for this site if [Evans Creek] has not applied for annexation."

50.     Based on City staff's assurances, Evans Creek decided to proceed with the annexation application for the northern 419 acres but terminated the 2014 Annexation Application for the southern 600 acres as well as the request for a Master Plan amendment.

51.     But even after Evans Creek narrowed its request, the City indicated its intention to downzone the northern 419 acres and force Evans Creek to develop the Property at an exceedingly reduced density in the interest of maintaining the Property as open space.   In short, the City planned to render development and commercial use of the Property economically impossible.

12

52.     Based on the continued misrepresentations by City staff and the City's stated intent to downzone and devalue the Property, Evans Creek terminated the 2014 Annexation Application as it related to the northern 419 acres.  Evans Creek filed a formal complaint due to the City's conduct in connection with the 2014 Annexation Application and received a refund of its application fees.

**D.     The City Rejects Evans Creek's Application For Annexation Again In 2020.**

53.     On January 27, 2020, Evans Creek once again applied for annexation of the Property into the City ("2020 Annexation Application") pursuant to Nev. Rev. Stat. 268.670 and RMC 18.04.301.

54.     RMC 18.04.301 sets forth the following review process for voluntary annexation: (i) the annexation process is initiated by the City Council upon petition signed by 100 percent of the record owners of the real property within the subject area, (ii) the application is then reviewed by the City of Reno Community Development Department and recommendation regarding approval is made to the City Council, and (iii) the City Council then holds a public hearing and issues a decision on the application.

55.     RMC 18.04.301(d) sets forth the following factors the City Council should consider when reviewing an annexation application:

a.     Location of the property to be considered for annexation;

b.     The logical extension or boundaries of city limits;

c.     The need for expansion to accommodate planned regional growth;

d.     The location of existing and planned water and sewer service;

e.     Community goals that would be met by the proposed annexation;

f.     The efficient and cost-effective provision of service areas and capital facilities;

g.     Fiscal analysis regarding the proposed annexation;

h.     Whether Washoe County has adopted a community management plan for the proposed annexation area;

i.     Whether the annexation creates any islands; and

j.     Any other factors concerning the proposed annexation deemed appropriate for consideration by the city council.

56.     RMC 18.04.301 does not require that an applicant for annexation simultaneously submit a request for a Master Plan amendment and, as such, Evans Creek did not seek to amend the Master Plan.

57.     Following a review of the 2020 Annexation Application, the City Community Development department and staff recommended unconditional approval thereof based on general compliance with the annexation review factors set forth in RMC 18.04.301.

58.     Specifically, the City Community Development Department found the following:

a.     The location of the Property is contiguous to the City on the north, west, and east sides, and the entire Property is located within the City's SOI. Extension of the boundaries of the city limits is logical as the Property is located within the SOI, which is the area the City has identified for expansion over a 20-year time period.

b.     The Property is located within the City's TMSA and has a Tier 2 Regional Land Designation. A Tier 2 Land Use designation denotes an area within the TMSA where there is generally less dense development occurring at suburban levels, with some higher density nodes, and is third in the priority hierarchy for development. These designations indicate the Property is located in an area planned to accommodate population and employment growth and receive municipal services over the 20-year planning horizon.

c.     The 2020 Annexation Application assumed the land use zoning designations assigned by the City would correspond to existing Washoe County zoning, which would allow for 203 single family residences. In reality, RMC 18.08.105 would apply and assign the closest conforming zoning district, which would result in higher density zoning than that of the County. Because Evans Creek is constrained by slopes, and Evans Creek did not provide a slope analysis to evaluate the reduction of potential dwelling units based on RMC hillside development standards, City Staff estimated approximately 580 dwelling units on the northern parcel and 30 dwelling units on the southern parcel. Thus, the subject annexation would assist in accommodating a greater amount of projected population growth than stated in the 2020 Annexation Application.

d.     The zoning assigned upon annexation would support single-family residential development. Based on the Housing Demand Forecast and Needs Assessment, while the subject annexation would assist in accommodating overall population growth, the assigned zoning would not support the increased demand for higher density multi-family housing.

e.     The Property is located outside the Truckee Meadows Water Authority (TMWA) and future development of the Property will be required to annex into the TMWA service area.

14

f.      The Property will be required to connect to the City's sanitary sewer system and sewer infrastructure is available on the south side of S. McCarran.  The final location of water and sewer connection would be determined at the development stage.

g.      While policy 2.1D of the Master Plan strongly encourage applicants to submit a concurrent Master Plan Amendment request, this is not a requirement.  Any future Master Plan Amendments or land use intensifications would be reviewed at the time of the application submittal.  Approval of the annexation request does not guarantee that future land use development applications would be approved.

h.      The Property is located within a designated Foothill Neighborhood.   Within designated Foothill Neighborhoods, the Master Plan promotes a mix of housing types to support documented housing needs as well as the preservation and integration of natural features into the overall design of a site.  The northern portion of the Property is designated Single-Family (SF) Neighborhood and SF15 zoning would be assigned upon annexation. The southern portion of the Property is designated Unincorporated Transition (UT) and a mix of UT5, UT10, and UT40 zoning districts would be assigned upon annexation.

i.      Evans Creek submitted two fiscal impact analyses.  The initial analysis based on 203 dwelling units represents a lower amount of development than would be allowed under the zoning assigned upon annexation.  The second analysis based on 1,256 dwelling units represents a higher level of development than would occur under the zoning assigned upon annexation.  Both analyses show a net positive fiscal impact to the City.  Further, the Finance Department's review of the analyses confirmed a net positive fiscal impact would result for a lower range of development based on gross density reductions.

j.      City of Reno Police and Fire currently provide services to properties adjacent to the Property and this would be a logical extension of their services.  Roadway and recreation facilities needed to meet level of service standards would be further evaluated when a project is proposed.

k.      The Reno Fire Department's closest fire station to the Property is Station 7, which has a current estimated response time of two minutes.  The second closest station is Station 3 with an estimated response time of seven minutes.  These response times are measured from the fire station to the closest point on South McCarran Boulevard and response times to actual buildings may be longer.

l.      The Property is located in a HIGH (hazard) Fire Wildland-Urban Interface Area where compliance with the States adoption of the Wildland-Urban Interface Code under NRS 477 and NAC 477.281 is required.

m.      The Property is currently served by the Truckee Meadows Fire Protection District, with supplemental assistance from the Reno Fire Department of up to 12 hours of service. Upon annexation the City would be responsible for all fire service costs associated with fire events.  The Reno Fire Department currently provides service to properties adjacent to the Property and this would be a logical extension of their services.

CAMPBELL & WILLIAMS
ATTORNEYS AT LAW
700 SOUTH SEVENTH STREET, LAS VEGAS, NEVADA 89101
Phone: 702.382.5222  •  Fax: 702.382.0540
www.campbellandwilliams.com

15

n.    The City's Public Works Design Manual (PWDM) requires two means of ingress/egress with all developments.  The Property has a recorded legal access on the south side of South McCarren Boulevard and a 50-foot roadway easement granted to APNs 222-080-11-13 along Lone Tree Lane.  Any future street network would be constructed by the developer and comply with City of Reno, Nevada Department of Transportation, and/or Washoe County access management standards.

o.    Parks and recreation facilities proposed to meet the City's level of service standards would be further evaluated at the time of development.

p.    Due to the Property's location in the City's SOI and the City's exertion of extraterritorial jurisdiction over the Property, all discretionary and ministerial land use approvals fall under the City's jurisdiction.  The Master Plan will provide the applicable policy framework and municipal code standards will govern further development of the Property.

59.    The 2020 Annexation Application was then publicly noticed as a two-part meeting for public comment prior to City Council action.  The first portion of this meeting was held on May 13, 2020.  The second portion of the meeting was held on May 27, 2020.

60.    Prior to the May 13, 2020 and May 27, 2020 meetings, the City knew that City staff had recommended unconditional approval of the requested annexation of the Property based on general compliance with the annexation review factors set forth in RMC 18.04.301.  City staff's recommendation was critical as Section 8.2C of the Master Plan states that the City Council shall "utilize City Staff's assessment of conformity and alignment with the Master Plan as a key consideration in decision making to enhance transparency."

61.    Despite the City Community Development Department's recommendation of unconditional approval, the City Council denied the 2020 Annexation Application on May 27, 2020 primarily based on the following reasons: (i) Evans Creek did not submit a Master Plan Amendment request; (ii) there is no demand for the mixture of land use types proposed on the Property; (iii) there are alleged private party water rights disputes on the Property; and (iv) fire danger.  While the City Council referenced other concerns—which were, in part and parcel, meritless—it did not develop a record or otherwise explain in detail as to why such concerns warranted denial under the applicable factors.

16

62.    The City's bases for denying Evans Creek's 2020 Annexation Application are pretextual and clearly lacked a legitimate rational basis.  First, the law is clear that Evans Creek was not required to submit a Master Plan Amendment request in conjunction with the 2020 Annexation Request, particularly when Evans Creek did not seek to alter the existing Master Plan.  Second, the City is experiencing a well-documented housing shortage, and annexation of the Property would plainly support sustainable growth in the City.  Third, the purported "water rights dispute"—which was not even mentioned by City staff and appears to have been fed to the City Council by community members—is, in reality, a minor easement issue with a neighbor that consisted of a single exchange of letters more than a year ago and never materialized into an actual legal dispute.  Lastly, fire is a danger to suburban areas throughout Northern Nevada, and the evidence introduced at the City Council hearing demonstrated that the City's existing facilities are sufficient to meet the fire protection needs of the Property when developed.  Moreover, the City Council was only tasked with considering whether to annex the Property and should not have addressed hypothetical concerns better suited for Master Plan amendments, zoning changes or development project requests that may or may not occur in the future.

63.    The pretextual nature of the City Council's bases for denying annexation is further demonstrated by the conspicuous absence of the prior explanations given by the City for undermining Evans Creek's annexation applications.  For example, the City previously cited the following concerns as grounds for its opposition to annexation: (i) the City's desire to maintain open space; (ii) Evans Creek's development would exacerbate the shortage of neighborhood parks and deficiencies in emergency access to nearby subdivisions; (iii) Evans Creek's development may cause harm to unidentified and unknown archeological sites on the Property; (iv) Evans Creek's development would create an annexation island of non-contiguous City property; and (v) Evans Creek's development of the Property would overburden the Washoe County School District.  None

of these reasons were mentioned let alone relied on by the City Council in denying the 2020 Annexation Application.

64.     Because of the City's ongoing refusal to grant annexation, Evans Creek cannot develop the Property and has been wholly deprived of any viable commercial use.  Moreover, Evans Creek faces daily trespass and vandalism of the property as local residents illegally trespass on the Property, fences and posts are routinely cut and damaged, metal gates are chained and torn down, firearms are illegally discharged at the risk of harming livestock and personnel, and "No Trespass" signs are ignored and damaged.  Evans Creek personnel are routinely abused by local residents when they attempt to prevent unlawful entry onto the Property or protect Evans Creek's livestock from harm.  Despite Evans Creek's repeated pleas for protection, no government authority has ever taken steps to address the near-constant trespass and property damage suffered by Evans Creek.

**E.      The City Intentionally Treated Evans Creek Differently Than All Other Similarly Situated Property Owners in the Area.**

65.     Prior to submitting the 2020 Annexation Application, Evans Creek reviewed available public records reflecting the City's treatment of other annexation applications submitted by landowners in Northern Nevada.  These records stand in stark contrast to the manner in which the City considered and ultimately denied Evans Creek's 2020 Annexation Application.

66.     Based on Evans Creek's review of the limited public records maintained by the City, Evans Creek is not aware of any other instance in which the City has denied an annexation request submitted pursuant to Nev. Rev. Stat. 268.670.  This is, of course, logical as any concerns about development should be reserved for future proceedings related to Master Plan amendments, zoning changes or development project requests.

67.     The City's denial of Evans Creek's 2020 Annexation Application was discriminatory, arbitrary, and capricious.  Additionally, the City intentionally treated Evans Creek differently than all other property owners who have applied for annexation pursuant to Nev. Rev. Stat. 268.670.

18

**FIRST CAUSE OF ACTION**

**(Violation Of The Equal Protection Clause – Class of One)**

68.     Evans Creek incorporates all previous paragraphs as though fully set forth herein.

69.     The Fourteenth Amendment of the United States Constitution provides in pertinent part "…nor shall any State deprive any person of life, liberty, or property, without due process of the law, nor deny to any person within its jurisdiction the equal protection of the laws."

70.     42 U.S.C. § 1983 provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

71.     Evans Creek has a constitutionally protected interest in the use of its Property.

72.     Evans Creek has suffered actual injury to its property interests through the denial of its 2020 Annexation Application and, therefore, has standing to bring this claim.

73.     The City denied Evans Creek the equal protection of the law guaranteed under the Fourteenth Amendment of the United States Constitution by arbitrarily and discriminatorily denying its 2020 Annexation Application without any legitimate rational basis.

74.     Based on Evans Creek's review of the limited public records maintained by the City, the City has not denied any other similar annexation request made pursuant to Nev. Rev. Stat. 268.670.  Thus, the City intentionally treated Evans Creek differently than all other similarly situated property owners in the area.

75.     The City acted with animus and ill-will toward Evans Creek as its denial of the 2020 Annexation Application was merely a continuation of the City's ongoing effort to maintain the Property as open space and prevent development.

76.     The City, acting under color of State law, has subjected Evans Creek to the deprivation of its respective rights, privileges, or immunities secured by the Constitution and laws and is therefore liable to Evans Creek for the resulting damage and harm.

77.     As a result of the City's conduct, Evans Creek has been harmed in excess of Seventy-Five Thousand Dollars ($75,000.00).

78.     As a result of the City's conduct, Evans Creek has been forced to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorney's fees and court costs.

## SECOND CAUSE OF ACTION

### (Violation Of The Fifth Amendment Taking Clause)

79.     Evans Creek incorporates all previous paragraphs as though fully set forth herein.

80.     The Fifth Amendment of the United States Constitution states in pertinent part "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  The Fifth Amendment of the United States Constitution is applicable to the States through the Fourteenth Amendment of the United States Constitution.

81.     Article 1, Section 8(3) of the Nevada Constitution provides "[p]rivate property shall not be taken for public use without just compensation having been first made, or secured," except in circumstances not applicable here.

82.     Evans Creek had a vested property interest in the Property and distinct investment-backed expectations in the commercial use and development of the Property.

83.     The City's denial of the 2020 Annexation Application has so restricted the permissible uses of the Property that Evans Creek has been deprived of all or substantially all of the economic value or use of the land.

84.     The City's conduct has restricted the use to which the Property may be put in order to obtain a public benefit (i.e. open-space preservation) without just compensation.  Indeed, by

CAMPBELL & WILLIAMS
ATTORNEYS AT LAW
700 SOUTH SEVENTH STREET, LAS VEGAS, NEVADA 89101
Phone: 702.382.5222  ●  Fax: 702.382.0540
www.campbellandwilliams.com

abusing its police powers to regulate land use, the City has effectively accomplished the result that the County's attempted condemnation proceeding failed to achieve years ago by forcing Evans Creek to maintain its Property as open space and de facto parkland for the public.

85.     The City's conduct constitutes a taking of Evans Creek's Property without just compensation.

86.     The City's denial of the 2020 Annexation Application constitutes a final decision regarding the Property such that the permissible uses of the Property are known to a reasonable degree of certainty.

87.     The City, acting under color of State law, has subjected Evans Creek to the deprivation of its respective rights, privileges, or immunities secured by the Constitution and laws and is therefore liable to Evans Creek for the resulting damage and harm.

88.     As a result of the City's conduct, Evans Creek has been harmed in excess of Seventy-Five Thousand Dollars ($75,000.00).

89.     As a result of the City's conduct, Evans Creek has been forced to hire an attorney to prosecute this action and, therefore, seeks recovery of its attorney's fees and court costs.

## DEMAND FOR JURY TRIAL

Evans Creek demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1.     For a judicial declaration that the City's denial of the 2020 Annexation Application was discriminatory, arbitrary, lacked any legitimate rational basis, and thereby unconstitutionally deprived Evans Creek of equal protection of the law.

2.     For a judicial declaration that the City's denial of the 2020 Annexation Application so restricted the permissible uses to which the Property can be put such that it deprived Evans Creek of all or substantially all of the economic value or use of the land without just compensation.

21

3.     For compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), in an amount to be proven at trial;

4.     For an award of attorney's fees and costs; and

5.     For such other and further relief as the Court deems just and proper.

Dated:  December 30, 2020                CAMPBELL & WILLIAMS

By /s/ *Philip R. Erwin*
DONALD J. CAMPBELL, ESQ. (1216)
J. COLBY WILLIAMS, ESQ. (5549)
PHILIP R. ERWIN, ESQ. (11563)
700 South Seventh Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

*Attorneys for Plaintiff*
*Evans Creek, LLC*


## JURY DEMAND

Plaintiff demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Dated:  December 30, 2020                CAMPBELL & WILLIAMS

By /s/ *Philip R. Erwin*
DONALD J. CAMPBELL, ESQ. (1216)
J. COLBY WILLIAMS, ESQ. (5549)
PHILIP R. ERWIN, ESQ. (11563)
700 South Seventh Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

*Attorneys for Plaintiff*
*Evans Creek, LLC*